E-FILED
Thursday, 20 March, 2008  01:26:37 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| RANDY EWING,                  ) | |
|                            ) | |
|            Plaintiff,       ) | |
|                            ) | |
|        v.                      ) | Case No. 06-1164 |
|                            ) | |
| CITY OF MONMOUTH, ILLINOIS, and   ) | |
| BRAD ZEIGLER, individually and in his official ) | |
| capacity as Police Chief of the City of     ) | |
| Monmouth, Illinois,             ) | |
|                            ) | |
|           Defendants.     ) | |

## ORDER

Before the Court is a Motion for Summary Judgment by Defendants City of Monmouth (the "City") and Brad Zeigler ("Chief Zeigler"). For the reasons set forth below, the Motion for Summary Judgment [#42] is GRANTED.

## JURISDICTION

This Court has jurisdiction over Plaintiff's § 1983 claims pursuant to 28 U.S.C. § 1331.

## BACKGROUND

Plaintiff, Randy Ewing ("Ewing"), began his employment with the City on June 15, 2000. At all relevant times, he held the rank of patrolman. Chief Ziegler is the Chief of Police for the City. On January 15, 2007, Ewing was terminated from his employment with the Police Department.

During his employment, Ewing was disciplined on three occasions.  In March 2004, Ewing received a one-day suspension for disseminating confidential information to someone outside the police department.  He received a two-day suspension in December 2004 after being involved in an accident with unauthorized passengers in his patrol car.  On September 13, 2005, Ewing received a five-day suspension for failing to take any action on persons he knew to be under the legal age for drinking.  It is this last disciplinary action that set off the chain of events giving rise to the claims asserted in this case.

On August 14, 2005, Ewing was on duty on third shift.  At approximately 3:15 a.m., he went to the residence of Officer Terry Hepner ("Officer Hepner") to visit with him during his break.  Officer Hepner was hosting a party at his residence that was being attended by four girls under the age of 21.  During this visit, Ewing was photographed with two girls that were under the age of 21, while in uniform; he was photographed standing between Katie Spratt ("Spratt") and Jenna Randolph.  Another photograph showed these girls consuming alcohol in front of a squad car.  Ewing assumed that Spratt was 19 years old, the same as the other girls, and did not ask to see any of the girls' identification.  Ewing had been trained to identify intoxicated individuals that were under the influence of alcohol while working as a police officer.

At some point shortly after the August 14, 2005, party, Mayor Rod Davies and Chief Zeigler received letters stating that there were photographs circulating throughout the City showing Officers Ewing, Hepner, and Brian Hall ("Hall") at Hepner's house where underage females were drinking alcohol.  These photographs were disseminated around the City and appeared in the media.  There was a public outcry surrounding the photographs, as well as allegations of official misconduct by the officers.  Chief Zeigler interviewed both Ewing

2

and Hepner to determine whether he should go forward with an investigation of the August 14, 2005, incident.  During this interview, Officer Hepner advised Chief Ziegler that the four underage girls were intoxicated when they arrived at the party as they had been drinking all day at the river.

On September 7, 2005, Ewing was on duty at approximately 6:00 p.m. around the time of the Prime Beef Festival Parade.  Chief Zeigler states that during the middle of the parade, Hepner approached him and pointed out a female on the porch of the Almaguer residence with her mother.  Hepner indicated that she was one of the underage girls who had been at his house the night of the party on August 14, 2005, that was under investigation.  Although they were able to observe a cup in the girl's hand, neither Chief Zeigler nor Hepner were close enough to determine what was inside the cup.

City Administrator Shannon Thompson ("Thompson") was at the parade sitting in front of the Almaguer residence with her friends and family; it is undisputed that Thompson was not on the porch drinking beer at any time during the parade.  (Plaintiff's response to Statement of Undisputed Fact ¶ 66)  A few minutes after talking to Hepner, Chief Zeigler testified that he spoke to Thompson and informed her that the female in the pictures circulating around town from the party at Hepner's house was on the porch, and Thompson replied that she was leaving.  Chief Zeigler then got in his squad car and left.

Chief Ziegler testified that Ewing was not present during his conversation with Thompson, but rather was two blocks away working the parade from the intersection of 9th and Broadway at that time.  Ewing claims that he was 15 to 25 feet away during this conversation and heard Chief Zeigler tell her that "she needed to leave and that there was the girls that were in the pictures up on the porch drinking and that it didn't look good, they

3

were the same girls that [the officers] were being suspended for." (Ewing Dep. at 206)
Ewing stated that Thompson returned to the porch and that he then walked up to
Thompson and motioned for her to come down to talk to him. Id., at 207. He testified that
he told Thompson that two of the four girls from the party were on the porch drinking. Id.,
at 210. She told him that he didn't need to be there and should leave. Id. He responded
that the girls needed to be arrested and that he was being suspended for this same thing.
Id., at 210-11. Thompson ordered him to leave. Id., at 211. Despite his claimed
impression that there was illegal underage drinking going on, Ewing did not attempt to
make any arrest that day or inform other law enforcement personnel of the suspected
criminal activity

On or about September 9, 2005, two days after the parade and party at the
Almaguer residence, Chief Zeigler called Ewing, Hepner, and Hall into his office to
discipline them for the August 14, 2005, party at Hepner's house. Ewing raised the incident
at the Almaguer's house and suggested that Chief Zeigler was trying to cover-up the
incident. Chief Zeigler responded that Ewing didn't need to worry because he didn't break
any laws or violations by not making arrests at the Almaguer party because of the City
ordinance permitting underage persons to consume alcohol in the presence of their
parents. Ewing responded "there was clearly a violation of the law and that I was being
suspended and I was being run over the coals for the exact same thing that he and his
superior did." (Ewing Dep. at 271) Chief Zeigler replied that if Ewing discussed this
situation or disseminated any information, it would constitute dissemination of information
and that because of his prior offense for disseminating information, he would be terminated.
Id., at 272. Ewing then received his five-day suspension for failing to take appropriate

4

action when confronted with four underage females in possession of and consuming alcohol in his presence; he did not grieve his suspension.  Officer Hepner also received a five-day suspension, and Officer Hall was suspended for two-days as a result of their involvement in the party.

Ewing claims that he had a subsequent conversation with Thompson during a Halloween party in the fall of 2005.  During this conversation, Thompson allegedly asked, "Why did you say anything to Zeigler?  I told you I would protect you."  Ewing states that he responded, "What you did was wrong, and you guys did the exact same thing that you suspended me for, and I don't think it's right."

On February 18, 2006, Ewing worked third shift.  At some point during his shift, Ewing reported that his squad car had been towed to a dealership because it would not move.  Other officers had driven the squad car earlier in the day without any problem and were unaware of any damage.  The dealership concluded that the damage to the transmission was due to abuse and was therefore not covered under the warranty.  On February 21, 2006, Chief Ziegler became aware of damage to Ewing's squad car and asked Johnson to investigate the damage.  Alvin Davis ("Davis"), the City mechanic, looked at the car and concluded that the transmission damage would not have been caused by normal wear and tear, but rather had likely been caused by a sudden shift to reverse from a forward motion or from reverse motion into forward.  Although he had never seen a transmission arrive in defective condition from the factory, Davis could not definitively rule out the possibility that the part could have been defective.  However, he stated that he did not believe that there was a problem with the transmission when it was received from the

5

factory because it had been driven for several months without incident since being replaced.

In March 2006, Chief Zeigler requested that the allegations of official misconduct be investigated by the Illinois State Police ("ISP").  During this investigation, Chief Zeigler placed Ewing, Hepner, and Hall on administrative leave with pay out of concern for their own safety due to the public outcry.  Chief Zeigler testified that he instructed the officers to make themselves available for interviews in connection with the ISP investigation.

On April 5, 2006, ISP Special Agent Bradley Beekman and Lieutenant Emil Johnson attempted to contact Ewing to obtain a statement; both Beekman and Johnson left phone messages for Ewing requesting an immediate interview.  Their calls were not returned. Ewing testified that this was because he left town on the morning of April 5, 2006, to go to a nearby lake where his cell phone didn't work very well and then left the country on a planned vacation to Thailand on April 6, 2006.

In May 2006, William Rees ("Rees") called the Mayor and told him about an incident in 2001 when Ewing had provided alcohol to his daughter, Katie.  The Mayor told Chief Ziegler, who requested that ISP Agent Beekman look into the allegation in the course of his investigation.  As a result of this complaint and investigation, Chief Ziegler first learned of Ewing's provision of alcohol to minors in December 2001.  In that incident, Katie Rees was with her friend Julie Jones ("Jones") when Jones called Ewing and asked him to purchase alcohol for her.  Jones and Rees met Ewing at a gas station where Ewing purchased a 12-pack of beer for them with Jones' money.  Shortly after purchasing the alcohol for Jones and Rees, Ewing stopped their car for having a chipped tail light. He said that he smelled alcohol on her breath and arrested them.  The charges were ultimately

dropped, and the previous Chief of Police counseled Ewing, but he was not otherwise disciplined for this incident.

The ISP investigation also revealed that in December 2001, the same Julie Jones and other friends who were underage drank beer at Ewing's house on more than one occasion. Ewing usually had beer at his house and saw Jones and her friends drinking when he came home. He admits that he did not tell them to stop, ask them to leave, take the alcohol away from them, or take any other action in response.

After receiving the ISP report at the conclusion of the investigation, Chief Zeigler consulted with the City Attorney, Marcum Spears, and decided to charge Ewing with violations of the Police Department Rules and Regulations and to recommend his termination. On May 30, 2006, Chief Zeigler advised Ewing that he was recommending his termination as a result of the following violations of the Department's Rules of Conduct: (1) his failure to respond to telephone calls and messages on April 5, 2006, with respect to the Illinois State Police investigation; (2) damage to a squad car that he caused on February 18, 2006; (3) reported incidents of him purchasing and/or providing alcohol to persons known by him to be under the age of 21 in the fall of 2001; and (4) his false statements to the Illinois State Police indicating that he was present at an incident involving Chief Zeigler that occurred in September 2005.

Ewing had the option of either having a hearing before the Monmouth Board of Fire and Police Commissioners or choosing arbitration under his collective bargaining agreement. Ewing elected to have the charges heard by an arbitrator rather than the Board and was placed on unpaid leave pending the results of a hearing.

The arbitration was held on August 30, 2006, and October 12, 2006.  On January 15, 2007, the Arbitrator issued his decision finding that there had been just cause for the discharge based on evidence that Ewing engaged in illegal conduct in that he provided alcohol to persons under the age of 21 in 2001.  This finding was based in part on the testimony of Jones that she and her friends drank beer at Ewing's house on more than one occasion in 2001 while they were underage and the Union's stipulation that Jones and two of her friends were underage when they drank alcohol at his house.  Ewing further conceded that he left the alcohol "where they could get it when he wasn't there" and that when he came home and saw them drinking he "took no action."  (Opinion and Award at 6)  The Arbitrator then found that discharge was appropriate given that the "demonstrated misconduct of providing of alcohol to individuals under the age of 21, in and of itself, was sufficiently serious for the City to impose discharge" and that Ewing's series of disciplinary actions demonstrated "an employee who is not amenable to progressive and corrective discipline." (Opinion and Award at 8-9)  Finally, he concluded that he had no rational basis to support a finding that Ewing would not again provide alcohol to minors, as evidenced by the fact that he took no action when he discovered underage drinking on August 14, 2005.

On June 27, 2006, Ewing brought this suit alleging that the Defendants' conduct deprived him due process of law (Count I), violated his First Amendment rights (Count II), and resulted in a denial of equal protection (Count III).  Defendants previously moved to dismiss Counts I and III of the Complaint.  Their motion was granted with respect to Count I only, and only Counts II and III remain.  Defendants have now moved for summary judgment.  The matter is now fully briefed, and this Order follows.

8

**DISCUSSION**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.  Celotex, 477 U.S. at 324.  Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]."  Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

I.     First Amendment Claim

Count II alleges that Ewing was discharged in retaliation for his exercise of his First Amendment right to free speech in that his discharge was actually triggered by his complaint to Chief Zeigler regarding the alleged cover-up of the incident involving Thompson at the Almaguer's house.[1]  In considering whether Ewing's conduct as a public employee was protected speech under the First Amendment, courts have traditionally applied the two-part test of Connick and Pickering.   The first inquiry is whether the employee "spoke as a citizen on a matter of public concern." Connick v. Myers, 461 U.S. 138, 148 (1983).  "If not, the employee has no cause of action for First Amendment retaliation and there is no need to reach the second part of the test. . . ." Spiegla v. Hull, 481 F.3d 961, 965 (7th Cir. 2007).  If the employee spoke as a citizen on a matter of public concern, then the second inquiry requires balancing the employee's interest as a citizen in making the comment versus the public employer's interest in promoting effective and efficient public service.  Id., citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968).

Although courts have traditionally considered the content, form, and context of the speech to determine whether the employee passed the first inquiry, the Supreme Court has recently clarified that the threshold inquiry is limited to whether the employee was speaking as a citizen.  Spiegla, 481 F.3d at 965; Mills v. City of Evansville, 452 F.3d 646, 647-48 (7th Cir. 2006).  It is only if the employee was speaking as a citizen that courts may look into the content of the speech.  Id.  In Garcetti v. Ceballos, ___ U.S. ___, 126 S.Ct. 1951, 1960

---

[1] Defendants have not argued that the arbitration precludes Ewing from pursuing his First Amendment or Equal Protection claims.

10

(2006), the Supreme Court held that "[w]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for first amendment purposes, and the constitution does not insulate their communications from employer discipline." In other words, if a public employee's statements were made pursuant to his or her official duties, he or she was not acting as a citizen regardless of the content of the speech. Spiegla, 481 F.3d at 964-66. His or her speech is not protected, and he or she has no claim for First Amendment retaliation. Id. Thus, the question is whether Ewing made his statements to Chief Zeigler pursuant to his official duties as a City police officer. See also, Morales v. Arthur Jones, 494 F.3d 590, 595 (7th Cir. 2007).

Ewing argues that the fact that he made his comments while off-duty delineates protected speech under Garcetti. In making this argument, it would appear that Ewing is trying to introduce new bases for his claim. The record reveals that he was off-duty when he had his conversation with Thompson in front of the Almaguer residence during the parade on September 7, 2005, and when he had a subsequent conversation with her at a Halloween party in October 2005, but there is no indication that he was off-duty at the time of his conversation with Chief Zeigler at the police department on or about September 9, 2005. However, a review of the Amended Complaint indicates that it is only Ewing's conversation with Chief Zeigler that he claims formed the basis for the retaliation, as ¶ 22 of the Amended Complaint clearly states:

> That the actions of the City of Monmouth, Illinois, and defendant Zeigler as aforesaid were in retaliation for plaintiff's exercise of free speech in complaining to Zeigler of the cover-up of the incident involving City Administrator Shannon Thompson in violation of plaintiff's rights of the Constitution of the State of Illinois, First and Fourteenth Amendments of the

United States Constitution and other laws of the State of
Illinois.

Ewing has admitted that he was on-duty on September 9, 2005, at the time that he
had his conversation with Chief Zeigler regarding the alleged cover-up and during which
Chief Zeigler allegedly threatened to fire him for disseminating any information about the
incident.  (Plaintiff's Memorandum in Opposition at 9) Accordingly, Ewing's suggestion that
his speech was protected because he was off-duty at the time he spoke is contradicted by
both his Amended Complaint and his own admission and is therefore without merit.  He
offers no other challenge to Defendants' assertion that he was acting as an employee
rather than a private citizen.

Even assuming that he was not, the same result would follow because that factor
alone is not dispositive of the inquiry under Garcetti and its progeny.  He made the
comment during a conversation with Chief Zeigler in the police station regarding the
discipline that would be imposed against him for his role in the incident at Hepner's house.
The matter unquestionably concerned the subject matter and official responsibilities of his
employment, because as a police officer, Ewing's primary responsibility was to prevent
crime, enforce the law, and apprehend violators, which would include taking action against
underage drinking.  In fact, Ewing admitted that, pursuant to applicable regulations, as an
officer, he is on duty 24 hours a day and has a sworn duty to make arrests when he
observes someone violating the law.  (Ewing Dep. at 212)  He was concerned that no
action was being taken to stop underage drinking, especially since he was suspended for
not taking action in a similar situation involving underage drinking.  He also had a
responsibility as a police officer to inform his superiors of possible violations of

12

departmental policy and the law.  Accordingly, Ewing's comments were made pursuant to his duties as a police officer because ensuring compliance with and enforcement of the law was part of what he was employed to do.  Spiegla, 481 F.3d at 966; Mills, 452 F.3d at 647-48 (police sergeant criticizing her supervisor's personnel decision spoke as employee).

The fact that his comments highlighted potential misconduct by another officer "does not change the fact that [he] was speaking pursuant to [his] official responsibilities, not as a citizen 'contributi[ng] to the civic discourse.'" Spiegla, 481 F.3d 967.  He did not "make a public statement, discuss politics with a coworker, write a letter to newspapers or legislators, or otherwise speak as a citizen." Id.; see also, Haynes v. City of Circleville, 474 F.3d 357, 364 (6th Cir. 2007) (finding that the fact that the plaintiff communicated solely to his superior officer is indicative of speech as a public employee.)  Thus, Ewing has failed to raise a genuine issue of material fact as to whether he was speaking as an employee when he uttered the words that formed the alleged basis for the retaliation, and there is no need to consider the specific content of his speech pursuant to Garcetti and Spiegla.[2]

Defendants' Motion for Summary Judgment as to Count II of the Amended Complaint is therefore GRANTED.

II.     Equal Protection Claim

In Count III, Ewing alleges that Defendants violated his right to Equal Protection by terminating his employment but not that of Officers Hepner and Hall.  The Equal Protection

---

[2] Parenthetically, the Court notes that had Ewing been found to have been acting as a private citizen, summary judgment would nevertheless have been appropriate as his speech is more accurately characterized as an employee grievance attempting to ameliorate his own discipline rather than addressing a community concern.  Brooks v. University of Wisconsin Board of Regents, 406 F.3d 476, 479 (7th Cir. 2005).

Clause of the Fourteenth Amendment protects individuals from discriminatory administration and enforcement of the law. Jackson v. City of Moline, 2006 WL 1554075 (C.D. Ill. 2006). In a traditional Equal Protection claim, a plaintiff must demonstrate that: (1) he/she is otherwise similarly situated to members of the unprotected class; (2) he/she was treated differently from members of the unprotected class; and (3) the defendant acted with discriminatory intent. Greer v. Amesqua, 212 F.3d 358, 370 (7th Cir. 2000).  The Seventh Circuit has also recognized an Equal Protection claim brought by a "class of one" when (1) the plaintiff alleges that he has been intentionally treated differently from others similarly situated and; (2) there is no rational basis for the difference in treatment or the defendant was motivated by discriminatory animus.  McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004).  To prevail in a "class of one" claim, a plaintiff must "negative any reasonably conceivable state of facts that could provide a rational basis for the classification."  Lauth v. McCollum, 424 F.3d 631, 634 (7th Cir. 2005)

Ewing acknowledges that in a "class of one" claim, he must identify a similarly situated individual who was intentionally treated differently than he was and that failure to do so is fatal to his claim.  (Plaintiff's Memorandum in Opposition at 10, *citing* McDonald; Stachowski v. Town of Cicero, 425 F.3d 1075, 1078-79 (7th Cir. 2005); Lauth, 424 F.3d at 634)  Here, he asserts that he is comparable to Hepner and Hall and urges the Court to frame the inquiry as whether Chief Zeigler and the City treated Ewing the same as Hepner and Hall related to the charge of underage drinking that was the subject of the original five-day suspension.  However, that is not the proper inquiry in this case, as his claim is not that he was treated differently in terms of the suspension based on the party at Hepner's house in August 2005.  Such a claim would be without merit given the fact that Chief Zeigler did

14

not recommend his termination based upon his conduct at the party, as well as the fact that Hepner and Ewing received the same five-day suspensions for their conduct in connection with the party.[3]  The relevant claim is whether Ewing was treated differently than Hepner and Hall in terms of his termination.

Under McDonald, a plaintiff must first demonstrate that he has been treated differently from others who were similarly situated.  Ewing acknowledges that this requires a showing "that he was treated differently than someone who was prima facie identical in all relevant respects as required by the court in Purze v. Village of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir. 2001)."  (Plaintiff's Memorandum in Opposition at 11-12) He contends that Hepner and Hall were officers of the same rank who served on the same shifts and who were under the same chain of authority.  Ewing then contradicts himself by asserting (without any citation to authority) that he need not show that his disciplinary history was identical to Hepner and Hall, and that he need only show that Hepner and Hall received a different disciplinary action arising out of the same occasion of the August 14, 2005, party at Hepner's residence.  This is an artful suggestion, yet it is axiomatic that when considering discipline that is alleged to have been unlawfully different under a progressive discipline system like the one in place here, the past discipline of the plaintiff and purported comparable employees is clearly relevant.

After receiving complaints regarding the party at Hepner's house, including complaints that the officers were retaliating against complaining citizens by issuing tickets or making harassing phone calls, Chief Zeigler requested an investigation by the ISP.

---

[3] The Court further notes that Ewing did not grieve or appeal his suspension, barring any challenge to the propriety of the suspension here.

During the course of the investigation, Ewing failed to report damage to a squad car that he allegedly caused on February 18, 2006, and failed to respond to telephone calls and messages on April 5, 2006, in connection with the Illinois State Police investigation. In May 2006, a citizen complained about Ewing having provided alcohol to his minor daughter in 2001. The investigation then uncovered additional instances of underage drinking in Ewing's presence and at his home, which Ewing does not deny. Ewing was also accused of making false statements to the Illinois State Police by indicating that he was present when Chief Zeigler had the conversation with Thompson in front of the Almaguer residence during the parade in September 2005. The record does not indicate that any additional instances of underage drinking were uncovered with respect to either Hepner or Hall, or that either officer arguably committed any other infractions during this time. Accordingly, the suggestion that either Hepner or Hall are similarly situated to Ewing is nothing more than fanciful.

Ewing also cites some testimony by a former City police officer, Dale Heiser ("Heiser") to the effect that: (1) no other officer was required to advise of his whereabouts; (2) Ewing was the only officer disciplined for damaging a squad car; (3) other officers were not even disciplined for punching holes in walls; (4) Ewing was the only officer disciplined for any statement of opinion relating to department conduct. Heiser, however, admits that he has never reviewed Ewing's personnel file or the investigative reports, lacks personal knowledge about the specifics of Ewing's provision of alcohol to minors, lacks personal knowledge about what was required of Ewing as part of the investigation or whether Ewing violated Chief Zeigler's order to cooperate with the investigation, and has no information

16

as to whether there were sufficient facts to support a charge for reckless damage to a squad car.

The probative value of Heiser's testimony is marginal at best and possibly inadmissable.  That being said, neither Ewing nor Heiser makes any attempt to demonstrate that any of these other unnamed officers were similarly situated to Ewing, and his claim must fail for the same reasons at the attempt to establish Hepner and Hall as similarly situated individuals.

Like the plaintiff in Purze, Ewing has failed to identify any similarly situated individuals, much less that they were treated more favorably under the same circumstances.  Thus, the Court need not go on to consider whether there was a rational basis for the difference in treatment.  Defendants are therefore entitled to summary judgment on his Equal Protection claim, as well.

## CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment [#42] is GRANTED.  This matter is now TERMINATED.

ENTERED this 20th day of March, 2008.


                                   s/ Michael M. Mihm
                                   Michael M. Mihm
                                   United States District Judge

17